Osberg and Bettis, U.S. Secretary of Labor, v. Foot Locker, Inc. All right, Mr. Rummel, you're on. May it please the Court, Myron Rummel of the Proskauer Firm, Attorneys for the Appellant's Foot Locker Retirement Plan. In our papers, we have raised a number of issues. I would like to focus on two of them this morning because they have the biggest impact on the scope of relief and I think they're also the ones that lend themselves to the most questions. First, the Court extended relief to thousands of participants who left the company long before this suit was commenced and should have been removed from the class on statute of limitations grounds. And second, the relief that was awarded to the class was much greater than what was needed to remove the wear-away that gave rise to the class misunderstanding. As a result of these two erroneous rulings alone, Foot Locker stands to incur over $100 million in liability over and above the relief that would otherwise be appropriate here, which we estimate is somewhere in the neighborhood of $25 to $50 million. The statute of limitations issue boils down to whether participants should have unlimited time to pursue a claim based on faulty communications about their benefits, even after they subsequently receive additional information that should have alerted them that something was amiss here. The summary plan description and the related communications that gave rise to the finding of liability here were issued back in 1995 and 1996 when the cash balance conversion took place. The lawsuit was not brought until a decade later in 2007. By that time, Mr. Osberg, the only named plaintiff, had been gone for Foot Locker for 5 years, and most of the employees whom he sought to represent had left much earlier. In the interim, you're... Could you explain a little bit what you think is sufficient to put people on notice? And maybe it would help if I just referred to the Novella case where we said that simply receiving a lower pension payment than under the correct information wouldn't be enough. On the other hand, it may be asking more to say there's an actual notice that here's how we violated your rights, or something like that, to put them on notice. So something in the middle is what we're presumably looking for. What is it that you say gives that something in the middle, and what's the standard? Let me just first say I think Novella also refers specifically about showing the participant how the benefit is calculated as being one of the things that... I would say it's probably enough. I didn't say that, but let's say that. Saying how the benefit is calculated here, it's sort of a complicated thing, because what it shows, what you showed them, is here's what your benefit is under the old plan, here's what your current account balance is, and here's the number that's controlling. And I would think that an ordinary, relatively uneducated person, and maybe even someone educated, might think, oh, this is nice, they're giving us the higher of two things. That must be a good thing. And not particularly recognize that what that means is that their benefit has been frozen for two years until the second number gets up as high as the first number. Right. So allow me to give a couple of examples. So, for example, in the appendix at 3184 to 3190, there is an example of the many benefit estimates that were sent to plan participants before they terminated employment or in response to their request. And the benefit estimate takes the participant through the math, showing what the accrued benefit under the prior cash balance plan was, then takes that accrued benefit and runs it forward as a cash balance benefit, and then significantly says, point blank, the monthly single life annuity payable at retirement is the greater of the amount determined under the cash balance formula or the amount provided under the provisions of the plan in effect on December 31, 1995. There were two arguments made by the other side as to why participants couldn't understand. The first was by Mr. Osberg, who said he knew he was getting a minimum lump sum, a minimum benefit that was bigger than the one in the cash balance plan, but he didn't know it came from the prior plan. So, again, here it says, point blank, that that greater benefit is the one available under the provisions of the prior plan. And, similarly, there were benefit estimates that did the calculation for a lump sum. One example is at 3139. And what you can see there is when the participant is alerted to the lump sum calculation, that calculation is performed by multiplying the accrued benefit by an actuarial factor. And the accrued benefit, 9213.49, is exactly the same as the accrued benefit as of 12-31-95. The first page of the estimate shows that accrued benefit is the annual accrued benefit to 12-31-95. And that same number is used to calculate the minimum lump sum. So it's just not correct to say that the participant wasn't put on notice. Yes, Mr. Counsel, but, you know, I think maybe we may be encountering a problem here of whether the audience to which these communications were addressed could possibly understand all that you were telling us, which may be entirely accurate. Now, you had Mr. Michael Stevens, the former CFO, on the stand, right? Right. And correct me if I'm wrong, you did not succeed during cross-examination to get Steven, who was a CFO, after all, to use, to conclude that he suffered, that he knew that he suffered the wear away, correct? Mr. Stevens admitted on the stand that if he got his minimum lump sum payment, his pay and interest credits, the benefits that were accrued under the new plan, did not count. I asked him that, and he admitted that. So did Ms. Glickfield, by the way, who was the one who did the calculations. He did say, or his counsel said, that he still couldn't have figured out that his benefits were frozen because the amount of the minimum lump sum went up. You see where the problem is immediately here in terms of trying to understand this case. It seems to me difficult to argue that class members who receive these communications could have had constructive notice of the so-called wear away when the CFO didn't exactly understand it, or at least didn't fully understand it, or even if he did fully understand it, all it would tell us was that a CFO had managed to understand it. How in heaven's names would the members of the class have understood this? I think, first of all, there is evidence that members of the class raised questions, although it wasn't referred to in the opinion. There's a set of internal email exchanges beginning at 3203 that specifically, and just to keep in mind the difficulties of defending a case like this, the testimony was that there were hundreds of phone calls a week to a call-in center. There were letters, there were responses to letters, there were estimates. But those emails specifically said, we're getting numerous questions, and the two most frequent questions were, why is my accrued benefit the same as it was on my last estimate slash statement? Why is the lump sum on a current estimate lower than the lump sum on an estimate I received last year? And then the email refers to an irate participant who called up because she didn't understand why her lump sum had gone down. What was the answer that was given? So there was correspondence that was provided, a form letter was provided that was geared to the situation. One version appears on 3126, and it explained that the minimum lump sum is a function of interest rates, and when the interest rates go up, the minimum lump sum goes down, and when the interest rate goes down, the minimum lump sum goes up. But there's no calculation in here that factors in those pay and interest credits. The essential claim here is, I thought I was getting the benefit of my pay and interest credits. And if you look at these calculations, it's very clear that whether you understand some of it or all of it, none of the pay and interest credits are going into this minimum lump sum calculation. And many, many of the benefit estimates specifically said that your minimum lump sum could go down. That's what it said. So to the extent that Mr. Stephen, who by the way, if you look at the cover letter to his estimate, it specifically tells him, we're not going to tell you the estimate into 1997 because it's a function of the interest rate and we don't know the interest rate. And it turned out that at the end of 1996, the IRS rate went up, and in fact, Mr. Stephen's minimum lump sum must have gone down, even though we didn't have a record of it, and many, many participants in 1997 were asking for that reason, why did my minimum lump sum go down? So I think what's going on here, Your Honors, and then I would like to try and switch to the relief in the little time that I have left, is participants had the ingredients of the claim. They understood that there was a benefit. Well, they were told that there was a benefit that was based on the prior benefit that could be greater than the current one. They simply didn't put two and two together and translate that into a benefit freeze the way their counsel did when he brought this case. And I think the question for Your Honors is, there is supposed to be a distinction between constructive notice and actual notice, and I think that those pieces of evidence constitute constructive notice. They give the participants the information from which they can inquire... They're not just putting two and two together, but doing some differential calculus. Well, I don't think it's differential calculus to see that your benefit is based on the old benefit and the new one isn't counting, as two of the witnesses admitted. Now, with Your Honors' permission, I'd like to go spend a couple of minutes on relief because I have very little time left. But it is true that Footlocker told its employees that their pension benefits were growing after 1996. And we're not contesting liability. We're not contesting that the summary plan description and the other documents that were sent out in 1995 and 1996 made statements that were found to be misleading, intentionally misleading, fortunately misleading, but there were all these individualized communications afterwards. And I think the Novella case says, Your Honor, that in a circumstance like this, there can't be a class claim because you have a class-busting statute of limitations issue. Now, with respect to... I'm not sure... That's an interesting point. I'm not sure it makes a practical difference. But are you asking that the class be decertified, or are you asking now that certain people be excluded from the class as a matter of some sort of relief calculation? Participants who left more than 3 or more than 6 years, depending on what the court does with the breach of fiduciary duty claim, more than 3 or more than 6 years before the case was started should be excluded from the class because it's an individualized question, a facts and circumstances question, as to whether they were on constructed notice of a claim. And then those people, the district court would do what then? Nothing? Because they would have to file new claims or conduct individual hearings for people? What happens at that point? They would not get class relief. That's correct. Well, you've reserved some time, and we'll... Yeah, I'm hoping the court will let me talk about relief on my rebuttal. Yes, indeed. Absolutely. Thank you, Your Honor. Ms. Clark. May it please the Court, I'm Julia Penny Clark on behalf of the class of plaintiffs. Mr. Rumeld finally came to the admission that the district court found that these communications were intentionally misleading, intentionally false. She said it over and over again in her findings. This is not a case of inadvertent miscommunication. And the reason that's important is because when you have this kind of large, multibillion-dollar company that sets out deliberately to conceal from its employees a fact that it thought would cause it to lose employees when it needed to keep them during restructuring, a fact that their vice president of human resources admitted would spread like wildfire if anybody found it out, you shouldn't assume that something that is buried in these complex calculations was actually enough to put people on notice that there was a freeze on their benefits here. And the district court examined every single communication that Footlocker could come up with and made the finding that no class member could reasonably have been aware that their benefits had been frozen during this period of time. Now, that brings me to the, I mean, and let me add one more thing, which is direct evidence, unlike the generalized circumstantial evidence which this court found was enough in Amara to support such a class-wide claim. In this case, we have the admission of Footlocker's pension manager, a woman named Carol Kanowitz, and this was in the district court's findings, that Footlocker made sure that no communication ever disclosed the benefit freeze to anyone. So Footlocker's claim here is that, well, you know, yes, we had this deliberate effort to conceal this from everybody for solid company reasons, and yet somehow they should have been able to sort their way through these complex calculations and figure it out. Judge Lynch asked about . . . They wouldn't need to work through the calculations necessarily. Isn't all that's necessary is in one year you get a statement that says, here's your old-term benefit, here's your current account balance, your pension lump sum will be the old-time one, and then the next year you get one that says essentially the same thing. Your account balance has grown a tiny bit, but it's still not up to the old plan lump sum, and you're going to get the lump sum. So you look at those two communications and put them together, and you know that you've been frozen, not that you didn't gain anything in that year. But, in fact, the statements did not disclose that. The 1996 statement, and there's a good example from class member Ralph Campuzano who testified at A2785, says here's your starting account balance and here's your old annual accrued benefits from the 12-31-95 plan. That was A2785. So that's at the beginning, January 1, 1996. Now his 97 statement, which you'll find at A2560, and I apologize that those aren't adjacent. I'm sorry about that, too, Your Honor. I had these joint appendices spread out on my dining room table all weekend, and I was shuffling from one to the other. So A2560 is Mr. Campuzano's 1997 statement. Ms. Clark, maybe you can take us back to A2785. Yes, Your Honor. The statement, Mr. Campuzano's statement. Tell us what on that page is something that we should focus on. Okay, so on the left side, it says your account balance as of January 1, 1996. So that's the conversion balance. And that, of course, as they told participants over and over and over again, was of equal value to your benefits accrued under the old plan, which the footlocker witnesses admitted was a lie because of the 9% discount rate. But here it gives you your opening account balance. This is the initial account balance that's supposed to be equal. In fact, at the end of that very next paragraph, it says your account balance represents the actuarial present value of your accrued benefit as of 12-31-95. And then it gives you your annual accrued benefits under the old plan. So that was if you had retired at normal retirement age under the old plan, you would have received $9,638.33 a year in benefit. Now, you know, as you understand, most people can't readily calculate the conversion from an annual benefit at age 65 to a lump sum present value as of now. So then you go to 2560. And this is the same participant. 2560, okay. This shows your account balance as of January 1, 1996. And then in furtherance of the second lie that footlocker told everybody, which is your account is growing every year with compensation credits and interest credits, they show the addition of a year of interest credit, the addition of a year of compensation credit, and your account balance at the end of that year. Nowhere on this statement does it show for comparison what you had earned under the old plan, nor does it show anything about a comparison so that you can even see that there's a horse race going on And in dealing with the so-called questions that came in from participants, Mr. Rumel's argument was that the most frequent questions were, why does my minimum lump sum change from year to year? That apparently was asked. And why isn't my balance growing? Well, dare I use the term alternative facts here? I mean, the email that was the only evidence that they presented in support of that argument is at A3205. It does not say anything about frequent questions, more frequent questions. All it says is, and I can't find my copy of it right now. I had it out. Mr. Clark, they've got to get you into these cases earlier. My appendix is prepared. Thank you, Your Honor. I appreciate the thought. 3205, which is rather difficult to read because it's just a poor copy of an old email. And now I've found it. All that it says is, if I remember correctly, Don mentioned two specific types of questions. And one of them is written as, why is my accrued benefit the same as it was on my last estimate or statement? Now, if you track through the joint appendix, it's clear that Footlocker, despite multiple opportunities to come up with any other examples of this, came up with one. And the dates on that one match this email precisely. One question, and that question, which is at A3172, is one of many questions that this participant asked, which is, why is the number shown as the annual accrued benefit the same figure as that shown on my retirement plan statement for 1231.95? That's all. The answer, which they sent him, is at A3159 to 3160. And all it did was repeat the false statements that were in the summary plan description. You started with an initial account balance of equal value. We added your compensation and interest credits, and you'll end up with the greater of this or that. That's all that it said. Can you take one minute briefly to address the seniority adjustment? And specifically, could you address the argument that the seniority adjustment was intended from the beginning as, depending on how charitably you view it, either an effort to compensate for wear-away in the case of people who were senior or to disguise the wear-away issue for those people who would encounter it most dramatically or be most likely to be paying attention to what's going on. However it's characterized, I think the argument is that that was something that was specifically tied to compensating for the effects of wear-away. And then what the district court is doing in terms of relief is fixing the wear-away problem. And I think the defendant's argument is, therefore, this becomes a kind of double counting. It gives some people a rather large benefit. I was rather impressed with the chart that they provided at one point in their brief. A very large bump that puts the relief on top of something that was intended to give them some relief for the kind of screwing they were getting. The trial judge followed Amara 5, which said that the appropriate remedy in reformation is to give the participants what they were promised. She found that what they had been promised was a starting account balance of equal actuarial value to their old benefit. Plus, in the case of these senior participants who would have gotten an early retirement subsidy under the old plan but weren't going to get it under the new plan, to make up for the loss of that subsidy, this enhancement. And then, like the younger people going on from there, they'd get the compensation credits and the interest credits. Footlocker's witness, Tom Kiley, tried to persuade her in his testimony that if they hadn't done the wear-away, if they hadn't done the 9% discount rate on that initial account balance, then they would not have given the senior people the enhancement on top of the initial account balance. She rejected his testimony on credibility grounds. And she found that these were independent, that Footlocker intended to give the enhancement as an independent form of benefit to the senior people whom it needed to retain during this period of restructuring that it was going through. That was the factual basis for her conclusion that the enhancement should be part of the relief in addition to fixing the 9% discount rate. I think that I understand your answer to the question. But you argued that case, didn't you, Amara? Am I right about that? No, actually, I didn't. You're thinking of Laurent, the Price Waterhouse. I knew I remembered you from one of those cases. If I could, Your Honor, with the Court's indulgence, I really think it's important for the Court to understand that what Footlocker is arguing for here in taking people out of the class and in removing the enhancement relief is not just a small, modest right-sizing of an award here. They're admitting they're fraud. They're admitting they lied to these participants. And then what they're trying to do with these reductions is effectively to take away a very, very large majority of the relief that the district court found was appropriate to remedy that fraud for this class of participants. Perhaps you could just address this question, which I'm sure Mr. Rummel will be able to do when he's done, which is this whole issue about the undeserved win-fall. That, Your Honor, does center on this enhancement that I was discussing with Judge Lynch, and the reason why the remedy here is not an abuse of discretion is that finding which she made, which was that the enhancement was promised independently of the equal value initial account balance, that these are two promises that Footlocker promised an equal actuarial value initial account balance. We're going to fix that. Footlocker also promised these senior employees, whom it needed to keep, that they would have this enhancement to compensate them for losing the early retirement subsidies in the planned conversion, and that both of those pieces of the remedy are important in order to fully compensate the participants. That's just not an abuse of discretion. She had two experts. She had factual support for her conclusion, and for her to reach that conclusion, applying the OMARA V standard on the record, on the expert testimony, is not an abuse of discretion. Here, effectively, what Footlocker is asking for would be a win-fall to Footlocker if they got the reduction in the judgment that they have requested. Thank you very much, Your Honor. May it please the Court. My name is Eric Cheverud, and I am representing the U.S. Secretary of Labor. We thank you for having us today. I would like to briefly discuss three issues implicated by this case. The first involves application of ERISA Section 413's statute of limitations, and in particular, Section 413's six-year from discovery limitations period for fraud or concealment. The second involves whether a plaintiff must show detrimental reliance in order to establish a violation under ERISA Section 404A. And the third is whether plaintiffs may demonstrate class-wide mistake by generalized circumstantial evidence. It's a long wind-up. Just get to each of them. Appellants argue today that a plaintiff must show elements of fraud in order to come under ERISA Section 413's fraud or concealment provision, and that because plaintiffs did not show an intent to defraud or detrimental reliance in this case, the fraud or concealment provision does not apply. This argument is foreclosed by this Court's precedent. In 2001, this Court examined the fraud or concealment provision in Caputo v. Fizer. In Caputo, this Court explained that the terms fraud on the one hand and concealment on the other have distinct legal meanings as used in Section 413. The fraud portion applies to, according to Caputo, to cases in which the underlying ERISA violation involves substantive fraud. However, the concealment portion of the provision refers not to fraud, but to a separate legal concept regarding concealment. To come under the concealment portion of Section 413, a plaintiff need only show that a fiduciary engaged in acts to hinder the discovery of a breach of fiduciary duty. This Court reaffirmed this holding in Genise v. Fay in 2012. And we suggest that the District Court's factual findings more than support application of the concealment prong of Section 413 to this case. Footlocker repeatedly lied to its plaintiff participants. It told them their initial account balance in the new cash balance plan was the actuarially equivalent lump sum of the benefit they had accrued under the prior pension plan. This was patently false. Footlocker also told plaintiff participants that they would continue to earn benefits as they continued their employment with Footlocker. But because of the way the initial account balance was calculated, this too was a lie. Plaintiff participants instead suffered a benefits freeze. Footlocker knew its statements to plaintiff participants were false. They wanted to cut costs through making retirement changes, and they didn't want participants to know about the benefits freeze for fear of a predictable backlash from employees. No one is happy when their employer tells them they will be paid less for the same work. These lies constituted self-concealing acts sufficient to come under the concealment prong of Section 413. With these lies told before the cash balance conversion and repeated many times afterwards, Footlocker acted to cover up its fiduciary breaches. And its actions were effective. As the District Court determined below, no participants were or could have been aware of the benefits freeze. And I would also refer, Your Honors, to our prior brief in this case when it was on appeal back in 2014 for a bit of discussion there, pages 27 to 29, about the information that participants were given. Second, appellants argue that a plaintiff must show detrimental reliance to establish a Section 404a violation. This argument is foreclosed perhaps first by appellants' discussion earlier that they are not challenging liability in this case, but also by the Supreme Court's decision in Signet Court v. O'Mara. In O'Mara, the Court explained that when a substantive provision of ERISA does not set forth any particular standard for determining harm, any requirement of harm, like a required showing of detrimental reliance, must arise from the law of equity. The Supreme Court explained that an equitable remedy like estoppel does require a detrimental reliance showing, but importantly, the equitable remedies of reformation and surcharge do not. Now, O'Mara dealt with violations of ERISA Sections 102a and 204h, not with Section 404a, but I would note that plaintiffs have also made out a Section 102a violation here. Section 404a similarly does not set a standard for determining harm. It merely sets out the duties to which ERISA fiduciaries must adhere. ERISA Section 409 does set out measures of harm applicable to fiduciary breaches, but as relevant here, it simply states that a breaching fiduciary shall be subject to such other equitable or remedial relief as the Court may deem appropriate. Mr. Sheffield, let me just ask you, since your time is about to run out, what weight are we to give to the views of the Secretary in a case like this? We have, as you know, amicus briefs from other people. How are you different from all other amici? Well, Your Honor, we are the primary enforcer of Title I of ERISA, and with that expertise, we believe significant weight should be given to our views. Thank you. So-called significant weight? Yes. Okay. Thank you. Your Honors, I see my time is up. There are no other questions. Thank you very much. Okay, Mr. Rummel, this is your big chance to deal with all of these remedy questions. Three minutes or less. Thank you, Your Honor. So, the class misunderstanding was about wear-away, the belief that if I continue working, I'm going to get more benefits, specifically the pay and interest credits. In Amara, the Court gave a precise remedy for exactly the same problem. You get the value of the benefit you earned before, and you add to it the pay and interest credits. And by doing it that way- Add to it what you were promised. And so there are some particular issues that may or may not have been raised in Amara with respect to what exactly was promised in the case of the seniority adjustments. Well, in Amara, there are also starting balance enhancements, and they did not factor into the relief, because the Court's guiding principle was, I'm going to give you the value of what you got before so as to facilitate that you continue working for more money, and I'm going to offset whatever you received in the interim, the benefit you got. We're not taking away those so-called seniority enhancements. If you got it, you're keeping it. What's really happening here is it's simply reducing the size of the relief because the person who got those enhancements suffered less or maybe no wear away at all as a result of those enhancements. One of my colleagues suggested it's like looking at two people in a Fair Labor Standards Act case, one of whom made $7 an hour and one of whom made $6 an hour. If you bring them both up to the minimum wage, one person gets less relief than the other, but that's because the claim is I should have gotten my minimum wage. Here, the only class misunderstanding, the only misunderstanding that's common to the class, is I was working for more benefits. I was working for those pay and interest credits. Now, the problem with what the District Court did here is Judge Forrest tried to fix the problem by adjusting the starting balance, and there's three problems with that. First of all, as a matter of law, if you're trying to recapture the prior benefit, you can't do it that way. The present value, the lump sum value of an annuity, what was accrued before, is determined as of the time the participant leaves because the applicable interest rate moves up and down in the interim, and that's what happened here. That's what created that problem about some minimum lump sums going down in 1997. The legally proper way to do it, if you want to capture what the person earned before, is to do it at the time the person leaves, which is the A benefit that was awarded in Amara and is the A benefit that we were advocating here. They wanted to do it in the form of an annuity. We would do it in the form of a lump sum since participants asked for lump sums, but it's the equivalent value, the point being you do it when the participant terminates. The other problem is that the judge resets the starting balance and removes the mortality assumption. Again, the legally correct way to recapture an annuity benefit, to convert it into a lump sum, is to factor in mortality for the simple reason that if I give a participant at age 50 a benefit that he would otherwise have to survive until age 65 for, you have to take a reduction into account to take into account the fact that the participant may not survive. That reduction alone is worth many, many millions of dollars in global relief here. So there was a complaint that the judge identified in her opinion that by setting the mortality assumption at the time of conversion, he in a sense overdid it because every year that a participant survives, that mortality reduction should become smaller. But if you do the A plus B relief that's in AMARA, you take care of that because you fix the mortality assumption as of the time the participant leaves so he gets the benefit of those so-called survivorship credits. Is there some magic to what you're calling the relief awarded in AMARA? What happened there and in any case is that the district court made certain calculations, made some discretionary decisions, came out with an answer. We then approved that relief as being within the district court's discretion. Now, it may be that there's some problem with the relief that's given here, but it doesn't seem to me that that problem can be that it's not exactly the same as what was done in AMARA because there could be a range of different benefits. I think that's fair, Your Honor. I do think that everything that was identified as being an explanation of why the relief was different here was something that was present in AMARA as well. Well, it may have been, but that doesn't mean that the district court was bound to do it exactly the same way that Judge Arderton did it or I forget it was Judge Arderton and Judge Kravitz who made the key decisions in AMARA. I take it, though, what you're really saying is that conceptually it is just wrong to do what Judge Forrest did, but I don't think you can say because it isn't done in the same format as was done in AMARA, therefore it can't be right. No, I think that's fair, Your Honor, and I think the way Your Honor phrased it is correct because if, in fact, the wrong that's identified is wear away, and if we're talking about equitable relief, the relief is supposed to be catered to the misunderstanding that's supposed to be fixed. And Your Honor mentioned the windfall before, so a participant who works one day into the new cash balance benefit plan, that's a participant who if I was trying to give him his lump sum value based on what he had earned before, we would do it the way the IRS says. We would take the 417E rate, that's 6%, and then we would reduce it by mortality. But because this participant works one day under Judge Forrest's relief, he gets the 6% reduction without any reduction for mortality, and if he's 50 years old, he gets a two-thirds increase in that benefit, all for working one day. I do not believe, Your Honor, that there was a class understanding that people could get a two-thirds increase in their benefit for working one day, particularly with a company that was making changes because it was in financial distress. So there is something inherently inequitable about the relief that the court ordered here. So no, it doesn't have to be what was done in Amara, but what Amara did is the more precise and maybe the most precise way to fix the problem that the court identified, and that's really what our point is here. So we would ask that the case be remanded with the direction to follow the principles of Amara. There may be unique circumstances here that warrant some distinctions, but to follow the principle of give the participant the value of what he had before and add to it the pay and interest credits, because that is the only common class misunderstanding that was identified in this case. Thank you, Your Honor. We appreciate the arguments on both sides. Very well argued. And we'll reserve the decision.